**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| Levone Shell, | : | Case No. 3:08-CV-2946 |
| Plaintiff, | : | |
| v. | : | **MEMORANDUM DECISION AND ORDER** |
| Commissioner of Social Security, | : | |
| Defendant. | : | |

Plaintiff seeks judicial review, pursuant to 42 U. S. C. § 405(g), of Defendant's final determination denying his claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (Act), 42 U. S. C. §§ 416 (i) and 423 and for Supplemental Security Income (SSI) under Title XVI of the Act, 42 U. S. C. §§ 1381 *et seq*. Pending are the parties' Briefs on the Merits (Docket Nos. 19 & 20).  For the reasons that follow, the Commissioner's decision is affirmed.

### I.  PROCEDURAL BACKGROUND

On August 1 and September 23, 2003, Plaintiff filed applications for DIB alleging that he had been disabled since January 29, 2000.  Plaintiff protectively filed a Title XVI application for SSI on July 22 and September 23, 2003, alleging that he had been disabled since January 29, 2000 (Tr. 68; 77-79; 516-518; and 520-522).  The applications were denied initially and upon reconsideration (Tr. 38-40).

Plaintiff requested a hearing, *de novo*, before an Administrative Law Judge (ALJ) (Tr. 35-36; 38-40; 523-526; and 527-529). On June 29, 2006, ALJ Yvonne Stam conducted a hearing during which Plaintiff, represented by counsel, appeared and testified[1] (Tr. 583). Vocational Expert (VE) Dr. Joseph Havranek appeared telephonically (Tr. 596). On February 21, 2007, the ALJ rendered an unfavorable decision in which she found that Plaintiff was not disabled under Title II or Title XVI of the Act (Tr. 21-30). The Appeals Council denied review on October 23, 2008, rendering the ALJ's decision the final decision of the Commissioner (Tr. 6-8). Plaintiff filed a timely action in this Court seeking judicial review of the Commissioner's unfavorable decision.

## II. FACTUAL BACKGROUND

*1.     Plaintiff's Testimony*

Plaintiff resided with his parents and siblings. He had not worked since January 29, 2000, the date he alleged that he became disabled due to an automobile accident. Plaintiff was involved in a" T-bone" motor vehicle crash. His vehicle was struck on the driver's side resulting in leg injuries (Tr. 127, 597-598). Plaintiff suffered from diabetes, hypertension, arthritis and severe leg pain. His impairments caused him to be depressed (Tr. 597, 598, 599).

In 1982, Plaintiff suffered from a gunshot wound in his left hip (Tr. 602). While employed in a glass factory, Plaintiff experienced a left knee injury when a large piece of glass fell and split his knee. The knee was persistently swollen (Tr. 601). Plaintiff stated that he was unable to work due to episodic severe pain and constant moderate to severe pain in his legs (Tr. 597). His ability to stand and/or walk was affected by the pain (Tr. 598). Since January 2006, Plaintiff used a cane continuously to ambulate

---

[1] The ALJ convened a hearing on April 21, 2006. Plaintiff and Linda Fuller, Plaintiff's fiancé, were present (Tr. 585). The matter was continued pending Plaintiff's acquisition of counsel (Tr. 587).

(Tr. 601). The throbbing and burning pain affected Plaintiff's ability to concentrate (Tr. 599). He suspected that an employer would be unwilling to accommodate these impairments (Tr. 598).

Plaintiff was prescribed an anti-inflammatory and a pain reliever. These medications eased the pain particularly at night (Tr. 599-600).

During the day, Plaintiff watched television, slept and lounged (Tr. 602-603). Occasionally Plaintiff accompanied his parents to the store to avoid cabin fever (Tr. 603).

Plaintiff was able to lift approximately twenty pounds occasionally; however, he could only stand for an hour on a good day. He could stand up to twenty minutes on a bad day (Tr. 603). Seven days during the month were considered good days (Tr. 604). Plaintiff estimated that he could walk three to four blocks with the cane (Tr. 605). He had difficulty ascending the steps on the bus. When on the bus, he had difficulty maintaining the agility to depart from the bus (Tr. 605). Prolonged sitting caused the onset of pain and stiffness (Tr. 607). Plaintiff estimated that he could sit for one hour to watch television but he could not stay in that position for two hours (Tr. 608).

When washing dishes, Plaintiff sat on a stool (Tr. 604). Plaintiff had trouble bending and stooping. Both activities caused intense pain and burning (Tr. 608). Because of his arthritic hands, Plaintiff's ability to lift and carry was affected. He attributed the pain and stiffness that radiated up his arm to arthritis (Tr. 609).

2.  *The VE's Testimony*

The ALJ posed the following hypothetical to the VE: a person of Plaintiff's age, education and past work experience, with the ability to occasionally lift twenty pounds, frequently lift ten and stand approximately six hours, sit six hours, occasionally climb ramps and stairs, never balance where an area is unprotected, occasionally crouch or crawl and avoid all exposure to hazard such as unguarded heights

and unprotected machinery[2]. The VE opined that this hypothetical plaintiff could not perform Plaintiff's past work either as it was performed or as it was indicated in the DICTIONARY OF OCCUPATIONAL TITLES and its ancillary publications. The need to stand and walk for six hours would eliminate Plaintiff's past relevant work of a machine operator (Tr. 611).

The VE testified that Plaintiff's skills developed at the light, unskilled level would not transfer to any jobs at the light level. Work at the light unskilled level that would accommodate Plaintiff consisted of a hand packager, plastic parts trimmer and assembly machine tender. There were approximately 3,000 to 4,000 hand packager jobs, approximately 300 to 400 plastic parts trimmer jobs and approximately 500 to 750 assembly machine tenderer jobs in the region (Tr. 611-612). The imposition of a sit/stand option would not alter the proposed jobs offered by the VE. Nor would the type of proposed job change if the job required the hypothetical plaintiff to reach overhead, occasionally squat or crouch, kneel or occasionally rotate his or her torso (Tr. 612). Naturally, the hypothetical plaintiff was subject to disciplinary action and/or discharge if more than one day per month was missed over and above the prescribed vacation, sick leave or other benefits (Tr. 613).

### III.  MEDICAL EVIDENCE

On January 27, 2000, Dr. John Baxter, an attending physician at the North Memorial Hospital in Robbinsdale, Minnesota, treated Plaintiff for injuries sustained in an automobile crash. Plaintiff's femur was fractured, his cornea scratched and his face and inner mouth were lacerated (Tr. 128). Plaintiff's cervical spine was free of fracture or dislocation; however, there was evidence of some degenerative changes in the cervical spine at C5-6 (Tr. 128, 142). The results from the computed tomography (CT) scan of Plaintiff's head were negative for intracranial injury (Tr. 133). Plaintiff had

---

[2] Plaintiff completed high school and two years of college (Tr. 88).

4

a right comminuted femoral shaft fracture (Tr. 140, 143).

Dr. Thomas N. Connor, an orthopedic surgeon, managed Plaintiff's care after the accident.  On March 8, 2000, Dr. Connor noted that the X-rays of the Plaintiff's femur showed progression of healing to the extent that Plaintiff was encouraged to advance with partial weight bearing (Tr. 174).  When examined in May 2000 by Dr. Connor, Plaintiff was weight bearing with his crutches and reported no concerns (Tr. 173).  The X-rays administered on or about September 13, 2000, showed some consolidation about the fracture (Tr. 171).  There was evidence of some progression of callous formation on January 17, 2001 (Tr. 170).  Dr. Connor continued the restrictions against employment through August 1, 2001.  However, Dr. Connor determined that the progression of the fracture was healing to the extent that Plaintiff could "take over his regular home chores and activities" (Tr. 161).

On May 6, 2002, Dr. Oliver H. Jenkins, an otolaryngologist, treated Plaintiff for persistent nosebleeds (Tr. 409).

Dr. Dexter Phillips, a family practitioner, monitored Plaintiff's medication intake for diabetes and hypertension commencing on May 22, 2002 (Tr. 177-180, 197-205).

On August 27, 2003, Dr. Nestor P. Zambrano, a physician with the Neighborhood Health Association (NHA), diagnosed Plaintiff with hypertension, hepatitis, substance abuse and chronic alcoholism (Tr. 206).  A personalized exercise prescription to benefit Plaintiff in his ongoing treatment of diabetes was employed (Tr. 205).  Plaintiff's diabetes and hypertension were monitored at NHA through March 25, 2004 (Tr. 197-205).

Dr. Robert A. Weisenburger, an orthopedist, reviewed Plaintiff's medical file on December 15, 2003, and opined that since the medical evidence showed that the fracture was progressing satisfactorily on August 1, 2001, it was a reasonable assumption that Plaintiff would achieve good ambulation in an

5

additional four months (Tr. 181).

In April 2004, Dr. Jacob Zeiss, a diagnostic radiologist, interpreted the X-ray of Plaintiff's left tibia/fibula. There was no bony abnormality; however, there was evidence of "very mild" osteoporosis and "very minor" degenerative changes (Tr. 408). Later in December 2004, Dr. Zeiss determined from an x-ray that Plaintiff's pelvis showed no intrinsic bony injury (Tr. 394).

Dr. Rekha R. Trivedi, a physical medicine and rehabilitation specialist, determined on May 20, 2004 that Plaintiff had a decreased range of motion in his right hip flexor and extensor, cervical spine, right hip and right ankle. The x-ray also revealed that the right femoral shaft fracture had been repaired with a rod. The fracture was healing (Tr. 193, 195).

Dr. David M. Rath conducted a physical residual functional capacity assessment on June 7, 2004. Plaintiff's exertional limitations included the ability to occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk about six hours in an eight-hour workday and sit about six hours in an eight-hour workday. Plaintiff's ability to push and/or pull was limited in the lower extremities (Tr. 209). Plaintiff could occasionally climb using a ramp or stairs, crouch and crawl (Tr. 210). Otherwise, Plaintiff had no visual, communicative, manipulative or environmental limitations (Tr. 210, 211).

In October 2004, Dr. Haitham M. Elsamaloty, a diagnostic radiologist, interpreted the results of the patient diagnostic report and determined that no evidence of fracture with hardware fixation was seen in the distal femur (Tr. 402).

In December 2004, Dr. Donald A. Baker, an orthopedic surgeon, determined that Plaintiff had osteoarthritis of the hips bilaterally, mild and osteoarthritis of the right knee, mild to moderate (Tr. 253).

On May 23, 2005, it was confirmed that Plaintiff had left knee degenerative joint disease and

softening and degeneration of the tissue underneath his kneecap (Tr. 297-298).

On June 9, 2005, Plaintiff's heart showed no evidence of ischemia (Tr. 454).

Plaintiff was treated at the Medical University of Ohio on July 5 and 7, 2005, for separate episodes of syncope exacerbated by the consumption of alcohol, illicit drugs, pain relievers and antidepressants (Tr. 276, 453). The secondary diagnoses included decreased blood supply to the brain, hypertension, type two diabetes and a weakened heart muscle (Tr. 276).

The doppler study of Plaintiff's carotid arteries showed stenosis in the range of zero to 15% on July 19, 2005 (Tr. 257).

Plaintiff was treated at Medical University of Ohio on December 23, 2005 for left hip and leg pain (Tr. 263). X-rays of Plaintiff's hip revealed mild narrowing in the left hip joint, consistent with degenerative joint disease (Tr. 265).

Dr. Baker determined from the X-rays administered on or about December 29, 2005 that Plaintiff's had mild degeneration of the cartilage (Tr. 232). The comminuted fractures had healed. The left knee showed early degenerative arthritis (Tr. 365).

On January 4, 2006, Dr. Phillips opined that Plaintiff could stand/walk for four hours and sit for four hours. It was Dr. Phillips' opinion that Plaintiff could lift/carry up to five pounds frequently and six to ten pounds occasionally. Plaintiff was moderately limited in his ability to push/pull, bend and handling (Tr. 324)

On February 10, 2006, Dr. Brent L. Rubin, a podiatrist, conducted a visual inspection of Plaintiff's feet and removed infected nail substances. Treatment with a topical ointment was continued (Tr. 311).

Except for a few descending pouches in the intestinal wall, Plaintiff's colon was considered

normal on March 9, 2006 (Tr. 225).

Dr. Baker suggested on March 30, 2006, that Plaintiff was experiencing early myofascial problems and perhaps symptoms consistent with the onset of rheumatoid arthritis (Tr. 578).

Dr. Douglas J. Federman, an internist, noticed on April 27, 2006, that Plaintiff's hypertension and diabetes were well controlled with medication and Plaintiff's lipid profile was within normal limits (Tr. 221).

On April 27, 2006, Dr. Lee S. Woldenberg, a radiologist, observed that the X-rays of Plaintiff's hands and knees showed normal alignment of the left hand, no joint narrowing, spurring or erosion was in the right hand, loss of the medial compartment with sclerosis in the left knee and basically a normal view of the right knee (Tr. 424).

In December 2006, Dr. Abdul-Azim Mustapha, an orthopedic surgeon, examined Plaintiff's hands and determined that there were no obvious deformities. The carpometacarpal grind test was positive for pain and negative for presence of painful tendinitis (Tr. 579)

## V. STANDARD OF DISABILITY

DIB and SSI are available only for those who have a "disability." *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); *See also* 20 C.F.R. § 416.920). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context)).

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are

8

identical for purposes of this case, and are found at 20 C.F.R. § 404.1520, and 20 C.F.R. § 416.920 respectively:

First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (*citing Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990)).

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability. *Id.* A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled. *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled. *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001)(internal citations omitted) (second alteration in original)). If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates. *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

## VI. THE ALJ'S FINDINGS

The ALJ made the following findings:

1. Plaintiff met the insured status requirements of the Act through March 31, 2004.

2. Plaintiff had not engaged in substantial gainful activity since January 29, 2000, the alleged onset date.

9

3. Plaintiff had the following severe medical impairments, namely, status post right femur fracture, hypertension and diabetes mellitus. Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C. F. R. Part 404, Subpart P, Appendix 1.

4. Plaintiff had the residual functional capacity to lift and carry ten pounds frequently, and twenty pounds occasionally, stand and walk in combination about six hours in an eight-hour workday and sit about six hours throughout the workday, all for a total of eight hours in a workday. Plaintiff can balance, crouch, crawl, climb ramps and stairs and use his right foot to operate controls occasionally. He can never climb ladders, ropes or scaffolds and must avoid all exposure to hazards.

5. Plaintiff was unable to perform any past relevant work.

6. Plaintiff was a younger individual aged 45-49, on the alleged disability date. Plaintiff was 52 years of age at the time of hearing which is defined as closely approaching advanced age.

7. Plaintiff had at least a high school education and was able to communicate in English.

8. Transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supported a finding that Plaintiff was not disabled whether or not he had transferrable skills.

9. Plaintiff was not under a disability as defined in the Act from January 29, 2000 through February 21, 2007.

(Tr. 23-30).

## VII. STANDARD OF REVIEW

The federal district court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g). Title 42 U.S.C. § 405(g) permits the district court to conduct judicial review over the final decision in a civil action. *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832-833 (6th Cir. 2006). Judicial review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *Elam ex rel. Golay v. Commissioner of Social Security*, 348 F.3d 124, 125 (6th Cir. 2003)

(*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *Longworth v. Commissioner Social Security Administration*, 402 F.3d 591, 595 (6th Cir. 2005) (*citing Warner v. Commissioner of Social Security,* 375 F.3d 387, 390 (6th Cir.2004) (*quoting Walters v. Commissioner of Social Security,* 127 F.3d 525, 528 (6th Cir. 1997)).  Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007).

In deciding whether to affirm the Commissioner's decision, it is not necessary that the court agree with the Commissioner's finding, as long as it is substantially supported in the record.  *Id.* (*citing Her v. Commissioner of Social Security,* 203 F.3d 388, 389-90 (6th Cir. 1999)).  The substantial evidence standard is met if a "reasonable mind might accept the relevant evidence as adequate to support a conclusion."  *Longworth, supra,* 402 F. 3d at 595 (*citing Warner, supra*, 375 F.3d at 390) (*citing Kirk v. Secretary of Health & Human Services,* 667 F.2d 524, 535 (6th Cir. 1981) *cert. denied*, 103 S. Ct. 2478 (1983) (internal quotation marks omitted)).  If substantial evidence supports the Commissioner's decision, this Court will defer to that finding "even if there is substantial evidence in the record that would have supported an opposite conclusion."  *Id.* (*citing Warner,* 375 F.3d at 390) (*quoting Key, supra*, 109 F.3d at 273).

## VIII.  DISCUSSION

In his brief, Plaintiff attributed six errors to the Commissioner's decision denying benefits.  First, Plaintiff is entitled to a period of disability that lasts at least through May 2004.  Second, the ALJ

11

supplanted the clinical evidence of non-union. Third, the ALJ erred in assessing Plaintiff's credibility. Fourth, the ALJ failed to properly analyze Plaintiff's impairments under 1.06 of the Listing. Fifth, the ALJ's assessment of Dr. Phillip's opinions is inconsistent with the assessment due a treating physician. Sixth, remand is appropriate so that the ALJ can consider new evidence submitted to the Appeals Council.

Defendant established three statements intended to persuade the Court to affirm the Commissioner's denial of benefits. First, substantial evidence supports a finding that Plaintiff's impairment did not meet or equal the requirements of the Listing § 1.06. Second, the ALJ properly analyzed the medical source opinions. Third, the additional evidence submitted does not warrant remand.

**A.     THE CLOSED PERIOD OF DISABILITY.**

Initially, it appears that Plaintiff is contesting the ALJ's failure to find that his impairments met or equaled 1.06 of the Listing. However, the crux of Plaintiff's argument is that the ALJ erred in finding the closed period of January 29, 2000, to January 27, 2002. Plaintiff filed his Title II application for a period of disability on August 1, 2003[3]. The ALJ found that Plaintiff was entitled to a closed period of disability beginning on the alleged onset date of disability of January 29, 2000 and ending on January 27, 2002 (Tr. 24). Since the Title II application was filed more than twelve months after the period of disability closed, the ALJ concluded that Plaintiff was foreclosed from receipt of benefits under 1.06 of the Listing. Plaintiff contends that the period of disability was closed prematurely since the medical evidence showed that his impairment continued through at least May 2004.

---

[3] The Magistrate need not consider the application for Title XVI benefits as benefits can only be paid from the effective date of filing. 20 C. F. R. § 416.335 (Thomson Reuters 2010).

12

Since claimants who suffer from a disability may later improve to the extent that they are no longer disabled within the meaning of the Act and are again able to engage in substantial gainful activity, the ALJ must define a "period of disability" as the basis for the award of disability benefits. 42 U.S.C. § 416(i)(2) (Thomson Reuters 2010).  A period of disability begins on the day that a disability begins, if the individual is fully insured at the time.  42 U. S. C. §§ 416(i)(2)(C); 416(i)(3)(A); 20 C. F. R. § 404.131 (Thomson Reuters 2010).  Disability ends after November 1980 with the close of whichever of the following is the earliest--(1) the month before the month in which you attain full retirement age as defined in 20 C. F. R. § 404.409; (2) the month immediately preceding your termination month (20 C. F. R. § 404.325); or (3) if the claimant performs substantial gainful activity during the re-entitlement period described in 20 C. F. R. § 404.1592a, the last month for which you received benefits.  20 C. F. R. § 404.325 (Thomson Reuters 2010).  If the claimant does not have a disabling impairment, the termination month is the third month following the month in which the claimant's impairment is not disabling even if it occurs during the trial work period or the re-entitlement period.  20 C. F. R. § 404.325 (Thomson Reuters 2010).

In order to receive disability benefits, the claimant must apply for a period of disability.  42 U.S.C. § 416(i)(2)(B); 20 C.F.R. § 404.603 (Thomson Reuters 2010).  The application must be filed within a specific statutory limitation period-either at any time while the period of disability continues or within 12 months of the end of the period of disability.  20 C.F.R. § 404.320(b)(3) (Thomson Reuters 2010).  The period within which to apply for a period of disability may be extended to 36 months after the month the applicant's disability ended if the claimant's physical condition limited his or her activities to such an extent that the applicant could not complete and sign the application or the applicant was mentally incompetent.  20 C. F. R. § 404.322 (a) & (b) (Thomson Reuters 2010).

13

The Magistrate finds that there is ample medical evidence to support a closed period of disability in January 2002. In August 2001, Plaintiff's fracture was healing, albeit slowly, to the extent that he had a satisfactory hip and knee range of motion. Performance of Plaintiff's regular chores and activities was no longer contraindicated. The progression of the fracture's healing process was not documented again until May 2004. Then Dr. Trivedi found that the right femoral shaft fracture was healing (Tr. 195). In December 2004, Dr. Baker found that the fractures were healing in good alignment or healed (Tr. 394). Based on the medical evidence, it is reasonable to assume that Plaintiff's fracture was no longer disabling as of August 2001. Under the statutory dictates for when a period of disability ends, the termination month is the third month following the month in which the claimant's impairment is not disabling. In this case, the period actually ended in December 2001. However, a finding that the Plaintiff's period of disability ended in January 2002 is not adverse to the correct legal standards or unsupported by substantial evidence in the record.

**B.    CLINICAL EVIDENCE OF NON-UNION.**

Plaintiff states that the ALJ acknowledged the X-ray results may have shown evidence of non-union. However, the ALJ did not think there was clinical evidence of non-union. In drawing this conclusion, the ALJ supplanted the opinion of the medical professional, Dr. Trivedi.

Under 1.06 of the Listing, a fracture of the femur or tibia may be considered disabling if, among other things, appropriate medically acceptable imaging evinces that the claimant's femur or tibia lacks a solid union. Relying on Dr. Trivedi's evaluation of the X-ray and medical evidence, Plaintiff's fracture appeared to be healing (Tr. 193). The ALJ construed this to mean that there was no clinical imaging that a union had formed.

It is within the ALJ's province to draw reasonable inferences from the medical evidence. *White*

14

*v. Commissioner of Social Security*, 572 F. 3d 272, 282 (6th Cir. 2009). Dr. Trivedi's interpretation of the X-rays shows continued healing. The ALJ's inference from this interpretation was that the union of the femur was not completed. The ALJ's inference in this case is reasonably based on the medically acceptable evidence.

### C. PLAINTIFF'S CREDIBILITY.

Plaintiff contends that his subjective complaints are credible even if unsupported by objective medical evidence. The medical evidence supports a finding that Plaintiff was credible as his condition could reasonably result in the limitations he described.

The ALJ, not the reviewing court, must evaluate the credibility of the claimant. *Rogers*, *supra*, 486 F.3d at 247 (*citing Walters, supra,* 127 F.3d at 531; *Crum v. Sullivan,* 921 F.2d 642, 644 (6th Cir. 1990); *Kirk, supra*, 667 F.2d at 538)). The ALJ is not free to make credibility determinations based solely upon an "intangible or intuitive notion about an individual's credibility." *Id.* (*citing* SOC. RUL. 96-7p, 1996 WL 374186, at * 4). Such credibility determinations must find support in the record. *Id.* Whenever a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints "based on a consideration of the entire case record." *Id.* The entire case record includes any medical signs and lab findings, the claimant's own complaints of symptoms, any information provided by the treating physicians and others, as well as any other relevant evidence contained in the record. *Id.* Consistency of the various pieces of information contained in the record should be scrutinized. *Id.* Consistency between a claimant's symptoms, complaints and the other evidence in the record tend to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect. *Id.* at 247-248.

Blanket assertions that the claimant is not believable will not pass muster, nor will explanations as to credibility which are not consistent with the entire record and the weight of the relevant evidence. *Id.* at 248. In the absence of an explicit and reasoned rejection of an entire line of evidence, the remaining evidence is "substantial" only when considered in isolation. *Id.* at 248, fn. 5. The articulation of reasons for crediting or rejecting particular sources of evidence is absolutely essential for meaningful appellate review. *Id.* (*citing Hurst v. Secretary of Health and Human Services*, 753 F.2d 517, 519 (6th Cir. 1985) (*quoting Zblewski v. Schweiker,* 732 F.2d 75, 78 (7th Cir. 1984)).

In the present case, the credibility determination finds support in the record. Plaintiff testified that he had difficulty walking three to four blocks with his cane, that he could not walk more than two blocks without his cane and that he could only walk one block on uneven ground. Even though these assertions are not supported by objective medical evidence, these limitations could reasonably result in the limitations he described. Accordingly, the ALJ should have found him credible.

Because this testimony was not supported by objective medical evidence, the ALJ made a credibility determination based on evidence in the entire record including Plaintiff's testimony regarding his limitations in walking, medical signs and laboratory findings and other information provided by the treating and State agency physicians. The ALJ applied the correct legal standard in assessing credibility. The Magistrate must defer to the result.

**D.     THE LISTING.**

The ALJ found that the consultative examiner, Dr. Trivedi, interpreted the X-ray to show healing which is an implication of non-union. However, Plaintiff's claims of his inability to ambulate effectively were incredible. As a result, Plaintiff's impairments were not of the severity to meet or equal 1.06 of the Listing. Plaintiff contends that this analysis under Section 1.06 of the Listing is flawed.

16

The relevant portions of 1.06 of the Listing are:

Fracture of the femur, tibia, pelvis, or one or more of the tarsal bones. With:

> A. Solid union not evident on appropriate medically acceptable imaging and not clinically solid; and
>
> B. Inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur or is not expected to occur within 12 months of onset.

20 C.F.R. Pt. 404, Subpt. P, App. 1.00B2b (Thomson Reuters 2010).

Section 1.00B2b provides:

What We Mean by Inability to Ambulate Effectively

> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.00B2b (Thomson Reuters 2010).

The definition explains that "ineffective ambulation" requires a limitation so serious that it does not permit ambulation without the use of a hand-held assistance device limiting the use of both upper extremities. *Motley v. Commissioner of Social Sec*urity, 2009 WL 959876, 11 (S. D. Ohio 2009) (*citing* 20 C. F. R. § 20 C. F. R. pt. 404P, § 1.00B2b(2)). Examples include a walker, two crutches, two canes, or an inability to walk a block at a reasonable pace on rough or uneven surfaces. *Id.* (*citing* 20 C. F. R. § 1.00B2b(2)).

Neither the clinical nor diagnostic findings reveal that Plaintiff is unable to walk effectively. Plaintiff ambulates with one cane and by his own admission, he is able to walk one block even if the

17

ground is uneven. The ALJ followed the procedure and her conclusion is supported by substantial evidence. Consequently, the Magistrate must defer to the ALJ"s finding.

### E.    TREATING PHYSICIAN OPINION.

Plaintiff contends that the ALJ erred in her assessment of Dr. Phillip's opinions. Specifically, the ALJ failed to evaluate the opinion of Dr. Phillips in the context of the whole record.

A physician is a treating source if he or she has provided medical treatment or evaluation and has had an ongoing treatment relationship with the social security claimant of the frequency consistent with accepted medical practice for the type of treatment and/or evaluation that may be typical for the condition subject to treatment. *Blakley v. Commissioner of Social Security*, 581 F.3d 399, 407 (6th Cir. 2009) (*citing* 20 C.F.R. § 404.1502). Opinions of treating physicians must be accorded controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and not "inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2) (Thomson Reuters 2010). If the ALJ finds that either of these criteria has not been met, he or she is then required to apply certain factors in determining the weight to be given a treating physician's opinion including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, **consistency of the opinion with the record as a whole**, and the specialization of the treating source. *Rogers*, *supra*, 486 F. 3d at 242. In this regard, the ALJ is required to look at the record as a whole to determine whether substantial evidence is inconsistent with the treating physician's assessment. 20 C.F.R. § 404.1527(d)(2),(4) (Thomson Reuters 2010). If the ALJ refuses to give controlling weight to a treating physician's opinion, an ALJ must adhere to certain agency-imposed procedural requirements by evaluating every medical opinion received and the ALJ must give good reasons in the decision for the

weight attributed to the treating physician's opinion. *Id*.

In this case, the ALJ gave extensive consideration to the entire record and the reports of Dr. Phillips. Dr. Phillips did not establish a treating relationship as he did not provide medical treatment with a frequent consistency. Dr. Phillips monitored multiple readings including blood glucose levels and measurement of blood pressure (Tr. 217-218). However, Dr. Phillips' notes do not provide a detailed picture of Plaintiff's impairments, the nature or extent of those impairments or medically acceptable clinical and laboratory diagnostic techniques. The evidence presented by Dr. Phillips does not qualify him as one of Plaintiff's treating physicians. Thus, the analysis implicated by the treating physician rule does not apply.

**F.    IS REMAND IS REQUIRED?**

Plaintiff contends that this case should be remanded pursuant to sentence six of 42 U. S.C. § 405(g) so that the ALJ can consider the opinions of Dr. Mustapha. This evidence is not cumulative and meets both the "good cause" and "material" standards.

According to 42 U.S.C. § 405(g), the Court may remand the case and order additional evidence to be taken into account upon a showing that there is new evidence (1) which is "material" and (2) that there is "good cause" for the failure to incorporate such evidence into the record in the prior proceeding. *Conner v. Astrue*, 2010 WL 455261, *3 (M. D. Tenn. 2010). The party seeking remand bears the burden of showing that remand is proper under 42 U.S.C. § 405(g). *Id.* New evidence is "material" only if: (1) it pertains to the plaintiff's condition prior to the date of the ALJ's original decision, *Id.* (*citing Oliver v. Secretary of Health & Human Services,* 804 F.2d 964, 966 (6th Cir. 1984)); and (2) there is a reasonable probability that the Commissioner would have reached a different disposition of the disability claim if presented with the new evidence. *Id.* (*citing Carroll v. Califano,* 619 F.2d 1157, 1162 (6th Cir.

19

1980)). Evidence of deterioration of a condition will not provide a basis for remand. *Id.*

The Magistrate finds that Plaintiff's new evidence does not meet the standard of materiality. Dr. Mustapha evaluated Plaintiff for bilateral hand pain, left greater than the right, and provided a lateral thumb splint on December 14, 2006 (Tr. 579). Under Dr. Mustapha's supervision, Plaintiff was evaluated on January 18, 2007, and an injection was administered into the joint located between the convex metacarpal head proximally and the concave base of the first phalanx distally and fitted Plaintiff for bilateral night splints (Tr. 570). Under either scenario individually or in combination, the diagnosis and resulting treatment of bilateral joint arthritis and carpal tunnel syndrome are not of the severity or duration to be considered disabling as defined under the Act. Even if the case were remanded so that the ALJ could consider this new evidence, there is no reasonable probability that the diagnosis or treatment provided by Dr. Mustapha would compel the Commissioner to reach a different disposition of this disability claim.

## VIV. CONCLUSION

Based on the foregoing, the Commissioner's decision is affirmed.

**IT IS SO ORDERED.**

/s/ Vernelis K. Armstrong
United States Magistrate Judge

Date:   March 18, 2010